May it please the Court, Charles Kling for Appellant Snoqualmie Valley Preservation Alliance. I intend to reserve five minutes for rebuttal. The Alliance is here to obtain review of a flawed decision by the Army Corps of Engineers in verifying nationwide permits for Puget Sound Energy's major upgrade to a large hydropower project in the Snoqualmie River. The first point I want to make, Your Honors, is that the Corps' decision is fatally flawed because the decision provides no rationale for concluding that the revised project is consistent with the nationwide permits. That's at Volume 1 of the Excerpts of Record. Tab 3 is the decision document. And in that document, on the first page, there's a project description. On the third page, there's something called a determination. But at the determination, there's no rationale whatsoever. All it says is, number one, quote, Number two, quote, That's it. The decision document goes on to talk about wetland mitigation, but it doesn't have any rationale whatsoever to connect the facts to compliance with the nationwide permits. And in our view, that makes the decision fatally flawed and makes it not entitled to any deference from this Court. I mean, if the Corps can't establish in its decision document what its rationale is, then this Court must look at it de novo, and there's no deference to their decision. But what law requires the Corps to explain itself on this one? Your Honor, that's standard, such as a Pacific Federation fisherman's case that we cited, a Ninth Circuit case. And that goes back to even Chenery, the old case against the SEC. An administrative agency has to provide reasoning or rationale for its decisions. They have to connect the facts to the law. Here, the law is compliance with these nationwide permits, and they have to connect those facts. So you have to be able to, at least at a minimum, discern the agency's path. So if you look, that's right in Pacific Coast Federation of Fishermen. A decision can be less than ideal clarity, but it's still the agency's path, if the agency's path may reasonably be discerned. The agency must articulate the reason or reasons for its decision. In that Pacific Coast fisherman's case, that cites the Motor Vehicle Manufacturers Association case by the United States Supreme Court. It's a primary principle of agency law. Can the Army Corps of Engineers consider anything that was done before FERC? Yes, absolutely, Your Honor. And the Corps said the Corps referenced those documents in its decisions. Not precisely, Your Honor. It did on page two of the letter, which was sent the same day with the decision document. So it's actually cited by, it says, the permittee shall implement and abide by the mitigation plan, and then it cites the FERC number and so on. Right, and that also was submitted to the Corps. But what it's not doing is connecting information that FERC may have established to show that this revised PSE project complies with nationwide permits. I mean, let's look at Nationwide 17. The alliance relies upon the Federal Register and what the Corps decided in establishing Nationwide Permanent 17. The Corps relies upon an unofficial, informal question and answers document that doesn't even mention Nationwide 17. Is 17 exclusive? Yes, Your Honor, that's our position. What makes it exclusive? Because, Your Honor, when the Corps was adopting Nationwide 17, in the Federal Register they said we could make this expanded and apply to all FERC-approved projects. But we're not going to do that. We're going to limit this nationwide permit to small projects because big projects may cause more than a minimal impact on the environment. There is no core interpretation about Nationwide 17. If you look at the Walker deposition at Volume 2 of the Excerpts of Record, Tab 8, she admits that the National Corps has never set forth an interpretation of Nationwide 17. The Corps tries to drum this question and answers document up as official guidance, but that's absolutely wrong. The Corps expressly uses regulatory guidance letters for official guidance. That's in our reply brief. This is not a regulatory guidance letter. This is an unofficial question and answers document, so it's not official guidance at all. But the Corps has announced for a long time, repeated recently, that it doesn't treat 17 or anything else as exclusive and that it can look to any of the nationwide permits as authorization. What it says, Your Honor, is that you can use multiple permits, but each multiple permit must apply. Nationwide 17 says that large hydropower projects can only go under Nationwide Permit 17 and it has to be a small one. Then you can't then go to Nationwide 39 and declare a hydropower project to be the same thing as an industrial facility. That's effectively what the Corps is trying to do. If Nationwide 39 doesn't apply, then you can't jump those together. Maybe I don't understand you. As I read NWP 17, it does not apply to any hydropower projects with more than 5,000 kilowatts of capacity, right? That's correct. Now, does this project have more than 5,000 kilowatts of capacity? Yes, Your Honor. Doesn't that end the issue? In our view, yes. They have to go under an individual permit. Oh, they can't go under a general permit, say, 39 or 33 or 3? That's our position, Your Honor, because if you look at the Federal Register, when the Corps was adopting this, that provides their interpretation of what this means. But even if you look at Nationwide Permit 39, our position is that a river widening project is not an attendant feature to an industrial facility. When you have in one Nationwide Permit a hydropower project, the Corps knows what a hydropower project is, and over here they say an industrial facility. That's something entirely different, as we set forth in our reply brief. But even if you accept it as an industrial facility, river widening is not an attendant feature to an industrial project. That is absolutely can't get there. Similarly, when you look at the maintenance provision, Nationwide 3, the same thing. A river widening project is inappropriate under maintenance. But as well, maintenance requires a return to existing conditions. In other words, you can maintain it, it comes back to existing conditions. It doesn't authorize expansion. Here you've got a 20% expansion of the dam to accommodate the river widening. Nationwide Permit 39 allows replacement, not expansion. When you've got, I mean, I can understand under Nationwide Permit 39 that maybe it could possibly apply to a hydropower project. Or if you look at just, what does that mean, a minor deviation? Judge Kuhnhauer said this was a minor deviation. Okay, if you have, say, a berm, and the berm has to be larger for some structural purpose to meet that same purpose it's now serving, okay, that's maybe a minor deviation because of some structural technical fact. But here, number one, there's nothing in the decision document that shows any way to, doesn't mention minor deviation. But number two, you've got a dam that's expanded by almost 20%, and the purpose is to accommodate river widening. Nationwide 3 specifically says that stream channelization is not authorized under that. Now what happened, Judge Kuhnhauer said in his footnote, he said, well, that's okay because even though river widening is not allowed under Nationwide 3, that particular item was approved under Nationwide 39. But then when you go to Judge Kuhnhauer's decision, he doesn't explain how stream widening complies with Nationwide 39. Why stream widening is an attendant feature. It's not an attendant feature. It's stream widening. To try and fit a hydropower project where they're out in the river, widening the river, putting in new power plant facilities, and calling that an industrial project, when you have over here in Nationwide 17 a specific call-out of hydropower project, I don't think you can do that. Another thing that the Corps mentions is they try to bootstrap administrative practice to support this interpretation that they have. But the administrative practice is inconsistent and hence meaningless. If you look at Walker's declaration, that's tab 8, volume 2, the excerpts of record, she lists 14 hydropower projects that did use nationwide permits. But in her deposition, the deposition is at tab 8, in her deposition it was revealed that there were 8 hydropower projects that used individual permits. There's no consistency here. She couldn't explain it. The decision-making in that administrative practice was ad hoc. It wasn't the product of reasoning, and it wasn't a consistent administrative practice, where in one time they do an individual permit, another time they do a nationwide permit when it's a hydropower project. So that is not persuasive at all. And what's important here is the revised Puget Sound Energy project, the revised project, after they came to the Court of Appeals from FERC, they revised the project. That project has not been previously considered for downstream impacts. We brought Dr. McCarthy's declaration to help explain. We agree that flooding impacts are technical. That's why we got a person with a PhD in water resource engineering to explain it to the district court and to this court. He concludes that the existing analysis of downstream flooding impacts is inadequate. Now where in the decision document is there some contrary explanation by the court? There's not. And there's no other memorandum in the core decision documents about that. Counsel, the court did not have to put this out for notice and comment. Was there any opportunity that you had to make your views known to the court before you filed suit? No, Your Honor. Because there was no public notice and there was no opportunity for comment. So you didn't know that the court was going to be approving this? No, Your Honor. In fact, if you look at the declaration of Janet Keller, she says she went to meetings and there was no mention of a core permit. There was opportunity to protest the project generally before FERC. Is that correct? Yes. But let's recall that in the administrative record when produced by the core, the 1996 environmental impact statement, the core complained about potential downstream impacts for river widening that the FERC was thinking of putting on PSE. And the FERC's response was, in response to comments, was, well, yeah, the core, you'll do a NEPA analysis under Section 404. In other words, you'll do an individual permit and do an individual NEPA analysis when you get the design details. So FERC expected the court to look at downstream impacts. What you have here, the core says, well, we've got this big record, so we must have looked at it. And then when we point that out, they call that irrelevant. So here's an important fact that's not explained by the core. Why did we do something different? I mean, if there was a document that said, well, we know about that, but here's why we did something different, we'd have a different case. But the decision document doesn't say anything. As well, let's look at river widening in violating general condition number 9. River widening violates general condition number 9 specifically, and also the decision document is inadequate to show compliance with general condition 8 and general condition 10. Those general conditions require a conclusion that impacts are minimized. It requires a conclusion of maximum extent practicable to avoid impacts. There's nothing in the decision document that explains how you get there. All you have is it complies with the terms and conditions. There's no rationale at all. I mean, it's talking about, in general condition 9, the course condition capacity of open waters, including stream channelization. So, at a minimum, the document must acknowledge that general condition 9 applies, and 8 and 10, and then it shows some rationale as to why it's consistent with those. I think what's important as well, Your Honors, is that the core is here and will say, well, you know, one thing they've pointed out is, oh, this is supposed to be a streamlined process. But there's countervailing policies here. As we cited in our reply brief, at the head of our reply brief, we cited an actual regulation, 33 CFR section 320.4L2. That requires special attention to even minor changes in rivers to avoid potential downstream flooding impacts. That's what a stated policy of the core is to worry about those issues. And so you've got that policy also has to be thought about and be consistent with. You can't just say, okay, well, we've got a streamlined process, so we're just going to rubber stamp this. There's important core policy matters that need to be considered. With that, Your Honors, I think I reserve the remainder of my time for rebuttal. Thank you, Mr. Kling. I can see. Thanks. Good morning, and may it please the Court. I'm David Gunter from the Department of Justice here on behalf of the Corps of Engineers. With me at council table is Mark Schneider. He's counsel for PSE this morning, and we're going to be splitting our time. I'd like to begin my argument time by focusing the Court's attention on the only two questions that this case presents. First, can Nationwide Permits 3 and 39 be used to authorize work done at large hydroelectric facilities? And second, if they can, then did the Corps reasonably find that Nationwide Permits 3 and 39 apply to the work that PSE is currently doing at Snoqualmie Falls? Now, before I sit down, I'll try and answer some of Mr. Kling's points, including answering any questions that the Corps might have about NEPA. But this case doesn't present any NEPA questions. The Corps verified the PSE project here under Nationwide Permits, and those permits have already had their own NEPA analysis. So let's turn to the question of whether the Nationwide Permits apply. The purpose of the Clean Water Act's general permit provision, including Nationwide Permits, is to establish a streamlined process, in Congress's words, to eliminate delays that are associated with the individual 404 permit process. And here I'll just note that the regulation that Mr. Kling just cited is a regulation that applies to individual permit applications, and doesn't necessarily apply to the streamlined process that is established by the Nationwide Permits. Sometimes Nationwide Permits will approve, will authorize work done that are a small amount of work. Sometimes, however, they'll authorize work done as part of a larger project, as long as that work has only minimal environmental effects. And here the Corps found in its decision document that the project that PSE is conducting will impact only .28 acres of waters of the United States. Of that, .2 acres is in wetlands that are not necessarily related to stream flow. In the stream bed, the total impact of this project will be only .8 of an acre. The Corps therefore found that this project would fit within the terms and conditions of Nationwide Permits 3 and 39. Now it's true that the decision document here doesn't go into a lot of detail about that decision, but the Corps' decision was made on an extensive administrative record that included a lot of information that FERC had gathered, and that the Corps had participated in and gone back and forth with FERC, with PSE, and with members of the public. The problem, and it may not be the only problem, but the core of the problem here seems to be downstream flooding, right? Yes, it is. That is the reason for the complaint. That's essentially their complaint. Lower the dam, produce more water, we're downstream. We know you're doing it to prevent upstream flooding, but it's going to impact us. What do we look to to see what the Corps analyzed in terms of downstream flooding impact? Well, this is a case in which the Corps' path on that can be reasonably discerned from the record. The Corps doesn't discuss downstream flooding impacts in the decision document itself, but the Corps was involved in the analysis of downstream flooding and going all the way back to the 1996 EIS for the PSE project as it was originally proposed. Then the Corps did a part of that proposed project on its own, actually in conjunction with the city of Snoqualmie. That's the 205 project that's referred to in the record. That had its own environmental analysis in a 1999 environmental assessment, which did discuss downstream flooding impacts. The Corps concluded that the PSE project would lower flooding upstream in the city of Snoqualmie by more than a foot, but would increase flooding downstream by no more than an inch. And that's in the context of a river that can rise and fall up to 12 feet in an average year. And so the Corps found in 1999 that there would be no economic impact, or negligible economic impact, I'm sorry, on downstream owners of this project. Now then, in 2001, the Corps looked at this project again, explicitly stating that it was doing so in order to satisfy the concerns of downstream owners. In 2001, it also farmed that analysis out to an independent hydraulic consultant who also agreed with the Corps' analysis that there would be essentially no environmental impact. And finally, in the 2009 environmental assessment for the PSE project, as it was finally configured, the EA in 2009 indicates that the Corps met with PSE to discuss environmental impacts of the project, including flooding impacts, and that the Corps ended up not having any concerns about the impact that it would have. Was all of what you just described included in the decision document? No, the decision document itself doesn't describe that. Does it refer to what you just described? The verification letter does refer to the FERC process. And I'd like to submit to the Court that this is exactly the kind of case in which the Court should uphold agency action if the agency's path can be reasonably discerned from the record. The reason for that is that the nationwide permit verification process is intended to be streamlined. As I mentioned, Congress set it up to eliminate delays. Now, the Court does need to have some agency reasoning that it is able to review, and here that reasoning comes from the record. For a streamlined process, the record here is actually quite extensive. It's unusually extensive because the Corps is piggybacking, essentially, on the environment analysis that FERC did and that the Corps participated in over the course of more than a decade leading up to the decision document. And for that reason— Sir, in the verification letter, is there any reference to downstream flooding? In the verification letter, there's not, but it does indicate— You told me the verification letter refers to the work that had been done to estimate downstream flooding. It does so at the bottom of page 2. This is AR 18245 when the Court indicates that FERC had been the federal lead agency responsible for the environmental effects. Now, this is a reference to compliance with Section 7 of the ESA, but as the Court will see in the record for the 1996 EIS and the 2009 EA, FERC actually analyzed all kinds of environmental effects in those documents, including downstream flooding. It doesn't use the word downstream flooding at all. The verification letter does not. All it does is says, for this project, the U.S. Federal Energy Regulatory Commission is a federal lead agency responsible for the compliance with Section 7. It doesn't say it did it. It doesn't say that FERC did any estimation of downstream flooding. Where in the verification letter is there some reference that backs up your statement that the verification letter does refer to downstream flooding? I'm sorry. If I said that the verification letter itself refers to the specific issue of downstream flooding, then I misspoke. It doesn't do that. Where does it refer to some other document or action which considered downstream flooding? Maybe that's irrelevant as far as you're concerned. I don't know. Actually, that is how I'd like to answer that question rather than stand here at the podium and look through this document. The key thing is not whether the decision document itself contains that analysis, but whether it can be reasonably discerned from the back and forth. As the Supreme Court said in State Farm and the Ninth Circuit has carried through that analysis, what's important is that the agency's reasoning be able to be discerned from the record. And here the Corps participated in the record. The Corps' opinions are in the record in many more places than simply in the decision document and the verification letter, including specifically the Corps' analysis throughout the FERC process on the issue of downstream flooding. Now, if I could turn to another of the points that Mr. Kling made and discuss the issue of Nationwide Permit 17. I disagree with the amount of deference that, in his view, the Corps' interpretation of Nationwide Permit 17 as non-exclusive is entitled to. But I think that the Corps' regulatory analysis of whether Nationwide Permits are not exclusive can begin at a point well in advance of simply the Corps' regulatory analysis. The text of Nationwide Permit 17 itself doesn't say that it is mutually exclusive or that other Nationwide Permits may not be applied to projects that have minimal environmental impact. We can also look at the purpose of Nationwide Permits, which authorize projects with a minimal environmental impact, and a hydroelectric facility is no different from other kinds of commercial or institutional developments with respect to the environmental impacts that less than one-half an acre of fill may have. Nationwide Permit 17 allows work at small hydroelectric facilities with no limitation on the amount of fill that is allowed. Nationwide Permit 39 is a little bit different. It sweeps in a wide variety of types of commercial and institutional developments, including developments that might not immediately spring to mind when one thinks of a commercial development like playing fields, but it does impose that one-half acre limit. So what's important here is that the PSE project will be much less than one-half an acre, and therefore Nationwide Permit 39 does apply. When you talk about half an acre, what do you mean half an acre of what? Well, a Section 404 permit is necessary for the discharge of dredger fill material into waters of the United States. So there's a number of elements to the PSE project, but the only element that is required to have a core permit is the discharge of fill material that is associated with the upgrade of the intake facilities. That's the concrete lining on the side of the river that is characterized by the alliance as river expansion. In fact, what that is is upgrading the intake facilities so that PSE can install more efficient hydroelectric generating equipment since the equipment that's currently there has been since 1898. The dirt which is going to be dumped in the river in order to make space for the concrete abutment. That is correct. Can be no more than half an acre. Can be no more than half an acre. And it isn't. In this case, it's .08 acres in addition to some other wetlands impacts that are also covered by the core permit. And let me turn now after... So that is what's covered by the core's verification under Nationwide Permit 39. Those .08 acres in the stream bed are for the upgrade of attendant features. Those are the intake valves that are necessary for the use and maintenance of this institutional structure. That language comes directly from Permit 39. Now, Mr. Cling claims that Permit 39 cannot possibly encompass a river widening project. But in fact, here, the only fill material is being put into the riverbed for purposes of upgrading those intake structures that allow water to go down the tail races and into the powerhouse of the electric facility. And the expansion of attendant features, such as intake structures, is authorized by the text of Nationwide Permit 39. There's also the question of Nationwide Permit 3, which covers the replacement of any previously authorized, currently serviceable structure. Here, the PSC diversion dam, which is the only element of the project that was authorized under Nationwide Permit 3, is clearly a currently serviceable structure, and it has been previously authorized. And PSC is replacing that structure with a structure that will actually impound less water and allow more water to flow over the falls. And that is why it is covered by Nationwide Permit 3. Now, before my time expires, unless the Court has further questions on other topics, I'd like to briefly address the NEPA issues that have been raised in the question of whether the Corps adequately considered the environmental impacts of this project. As I mentioned at the outset of my argument, Nationwide Permits undergo NEPA analysis at the time they're issued to ensure that any activity authorized under those permits will only have minimal adverse environmental impact. So here, if the PSC project is encompassed within Nationwide Permit 3 and 39, then no further NEPA analysis is required. And the Alliance concedes this in its brief. If the Nationwide Permits apply, then specific individual analysis by the Corps of these adverse impacts, including any downstream flooding impacts that may exist, is not necessary. The other point that I'd like to make about NEPA is that FERC actually did NEPA analysis of the final project as it was finally configured and is currently being constructed by PSC. The 2009 EA includes a finding that the final configuration of that project would have no significant impact on the quality of the human environment, and that EA included water quantity issues. Are the NEPA investigations, are they fungible? If the NEPA is done by FERC, that will satisfy the Corps? Or do they have different points of focus when they conduct a NEPA analysis? There are two answers to that question. The first is that FERC's NEPA analysis is not necessary for the Corps' verification here because the Corps verified under Nationwide Permits. They've already undergone their own NEPA analysis. The second answer is that the Corps is entitled to rely on FERC's findings in the EA. In fact, I think that in this case it would have been enough for the Corps simply to say the 2009 EA found that there would be no significant impact, and that ends the question. The Corps didn't do that because it was not necessary for it to analyze environmental impacts in the decision document itself. That was a Nationwide Permit decision that doesn't need its own NEPA analysis. But yes, I think that the analysis that FERC did could be relied on by the Corps, especially given the streamlined nature of this process. And there's a memorandum of understanding between FERC and the Corps that establishes FERC as the lead agency for purposes of environmental analysis, and that's in the verification letter itself. As a result, the declaration that Mr. Kling mentioned by Mr. McCarthy, or Dr. McCarthy, is completely irrelevant. If it had been given to FERC at the time of the 2009 EA, which went out for public comment, and had said to FERC, we have another analysis that we think you should consider, and you should look more closely at the issue of downstream impacts, then that decision would be reviewable, and FERC could be – judicial review of FERC's decision could be sought. But this is a separate decision that doesn't require its own NEPA analysis. And as a result, extra record materials, such as the ones that the Alliance is trying to introduce here, are not relevant. Unless the Court has further questions, I'd like to ask that it affirm the judgment of the District Court. Thank you, Counsel. Thank you. Mr. Schneider. Thank you. Good morning. I'm Mark Schneider, and I represent Puget Sound Energy, and I'd like to address two points. Point number one, the Court did not act arbitrarily and capriciously when it considered the project impacts. And point number two, this lawsuit and this appeal are an improper collateral attack on the FERC license. Starting in 1991 and continuing through today, Puget Sound Energy has complied with every applicable legal requirement necessary for the renovation of the Snoqualmie facility. We obtained the FERC license. Puget Sound Energy obtained a water quality certification, a Coastal Zone Management Act determination, approval from the resource agencies under the Endangered Species Act, a substantial shoreline permit, and, of course, approval from the Army Corps of Engineers. And once those approvals were obtained, Puget Sound Energy did the construction to implement the requirements of those permits and licenses. It has removed the old dam. It has performed the excavation on the left bank. It's constructed a new river wall. It has installed 50% of the diversion dam, and it's scheduled to complete the remainder of the diversion dam this summer. As the Court knows, the Snoqualmie Indian tribe had challenged the FERC license several years ago. They appeared in front of Judge Tallman, Judge Fisher, and visiting Judge Ezra, and at that point the Snoqualmie tribe had challenged the license on the ground that they contended that the dam should be removed in its entirety and that the Snoqualmie River should be allowed to flow unimpeded over the falls. FERC did not agree with that contention, and the Court, in an opinion issued by Judge Tallman, upheld the FERC license. As to the contention by plaintiffs that the Army Corps acted arbitrarily and capriciously, the administrative record refutes that argument, and the record shows specifically that the government considered not only the impacts of the Puget Sound Energy project, but it also considered the impacts of the Puget Sound Energy project, coupled with the impacts of the earlier Section 205 project. I'm not going to cover the entire administrative record. I just want to highlight briefly four documents. First is the FERC 1996 Environmental Impact Statement. That's four excerpts of record tab two. FERC studied the many years of studies that had been undertaken on the Snoqualmie River. It specifically contemplated the potential project elements, and it concluded that the renovation would increase downstream peak flood stages by 0.05 feet at Duval, 0.13 feet at Carnation, and 0.17 feet at Fall City. Document number two, the Corps' 1999 Environmental Assessment for the 205 project. The Corps studied the downstream impacts and concluded that the impacts would be, quote, negligible. That's three excerpts of record tab six, administrative record page number 58. Document number three, the Corps' 2001 Downstream Impacts Study. That concluded that the Section 205 project would cause, in the event of a 100-year flood, an increase in water levels of 1.2 inches downstream. That's three excerpts of record tab five, administrative record 5208. And finally, and I say finally only for purposes of the discussion this morning, finally, it's not the only thing in the record, but finally for purposes of the discussion, there's the FERC 2009 Environmental Assessment, and that's three excerpts of record one, pages 18339 and other pages. FERC specifically analyzed the environmental impacts not only of the renovations at issue in this lawsuit, but the 205 project, and it concluded, and I'm quoting, quote, the proposed action will provide essentially the same level of reduction in flood elevations as the currently licensed project, although in a slightly different manner. The Section 205 project removed natural obstructions to the river channel upstream of the dam, and as a result the downstream flow constriction point is now where some of the above ground plant one facilities are located. In sum, the government did consider the cumulative impacts of the PSE project as well as the impacts of the project and the Section 205 project. Accordingly, the appellant cannot demonstrate that the Corps acted arbitrarily and capriciously. Secondly, this is an improper collateral attack on the FERC license, and in answer to your question, Judge Bea, as to whether the appellant did have notice of the various processes, the answer is yes, and the answer is found in two places. First is the administrative record, the index of the administrative record, which shows all the notices that had been provided, the extensive public process that had been undertaken. Additionally, in our supplemental excerpts of record, pages 5 through 8, we list some of these specific places where there was notice given to the downstream interest. And the reason this is a collateral attack is because the Federal Power Act vests authority in the FERC to determine, quote, what is best adapted to a comprehensive plan for developing a waterway for all beneficial uses. And it further requires FERC to give, quote, equal consideration to power development, energy conservation, protection of fish and wildlife, recreational opportunities, and flood controls. And here FERC made that very determination. Is it your point that the Corps of Engineers had nothing to do under the Clean Water Act, should not have been interfered at all? No, Your Honor. The Corps absolutely has the duty to apply the Clean Water Act, and in fact that's why Puget Sound Energy actually applied for the authorization under the nationwide permits. What the Corps doesn't have authority to do is to revisit, as appellants would ask, to revisit the fundamental determination of FERC because that is, as this Court has held both in the context of the Federal Power Act and the Magnuson Act and otherwise, that is a fundamental attack on the FERC license. Because what FERC did, FERC took all of those interests, all of this flood control, fish habitat, wildlife habitat, recreation, aesthetic interest, power generation, and it said here's how we are going to allocate those resources. And it made the determination the dam was going to stay in place, and in fact a certain amount of water would be diverted and a certain amount of water would pass over the falls. They made that determination. As this Court held in the California Save Our Streams case versus Yutter, it said if you are going to develop your complaint in a way that kind of, that really is going to be attacking a fundamental FERC decision, that's an improper collateral attack. And that's what the appellant has done here. In the district court, the appellant asked for the imposition of, quote, mitigation measures. And mitigation measure number one that they sought was to have the dam built up to the prior height. Well, that's completely inconsistent with the requirements of the FERC order. Mitigation element number two that they asked for. What's the role of the Corps of Engineers and the CWA if FERC had made all the decisions properly? It's to ensure that it fits within the language of the nationwide permit. The Army Corps worked with FERC over the 19-year administrative process to ensure that flood control and other issues were adequately considered during the time of that FERC process. But what, as counsel for the United States. Your position is that the appellant can't attack the Corps determination without attacking FERC. Absolutely. This is just like the California Save Our Streams case where the court said you can't challenge a biological opinion when the essence of the case is to challenge the FERC license. That's what's going on here. The essence of the complaint, and it's indicated by the declarations of the appellant's members, it's indicated in the pleadings of the appellant, is to say we're concerned about these downstream concerns. The time to raise that was during the FERC proceedings. The way to do that is to intervene as the Snoqualmie Indian tribe did in the FERC proceeding. Appellants didn't do so. The next thing to do is to seek a request for rehearing as the Snoqualmie Indian tribe, but appellants did not do so, to request relief. And, in fact, FERC granted relief to the Snoqualmie Indian tribe. When they filed their request for rehearing, FERC said we're not going to require the tear down of the dam, but we are going to substantially increase the minimum in stream flows. And then the next step in the process, which appellant did not follow here, is if they were unhappy with the allocation of resources decided by FERC, at that point they should have filed a petition for review before this court, as the Snoqualmie Indian tribe did. They did not do so. Because it's a fundamental attack on the FERC license, it is an improper attack, and this lawsuit should be dismissed. Unless the Court has any other questions, those are my remarks. Thank you. Thank you very much, Counsel. Mr. Kling? Thank you, Your Honors. While the Department of Justice attorney was going through the record and stating all the various documents that support their case, what was lacking was that there's nothing that shows that the core staff people actually ever looked at those documents. It's not there. There's nothing in the decision document. There points to no memorandum, no email, nothing at all, that shows that a core staff person in 2009 looked at those documents and made the conclusions that they say. The next point. He claims that it's .08, and he's trying to minimize the impact. Well, if you look at Excerpt to Record 3, Volume 3, Tab 3 at page 9, will excavation or dredging be required in water or wetlands? Answer, yes, .4 acres. So he's incorrect about that. It's a 10% river widening. It was 31. I'm sorry, you quoted acres. He was quoting inches. I'm not sure I understand. No, he was saying the amount of fill in waters was .08. At one point he was talking about inches amount of flooding, and at another point he said .08 acres of wetlands were impacted. At that site I made, it's .4 acres. It was 31,000 cubic yards of excavation in the water. It's a huge amount. It widened the whole river by 20 to 25 feet for hundreds of feet long. Mr. Schneider said that the FERC 1996 EIS looked at the specific project elements. That is not true. The 1996 EIS looked at the river widening that the Corps was thinking about in the Section 205 project. This is new river widening further downstream that was not addressed at that time. That's why Dr. McCarthy said that the study of downstream impacts is inadequate. The other thing Dr. McCarthy said is we've had three of the four largest floods in recorded history after the 205 project. There's new information that requires new studies. You did not hear, counsel, either one saying there was a new downstream impact study after the Corps revised the project, and instead what they said was, oh, look at the, the FERC looked at all this stuff. They looked at water quantity. They looked at flooding. Well, they didn't look at downstream impacts. Counsel, if we were to agree with you, what is it that you get? Thank you for that question, Your Honor. That's where Mr. Schneider and PSC is misplaced. What we should get is an individual permit process with a full NEPA analysis. However, a NEPA analysis is very rational. That's not really brief, but what happens is they have to look and see what studies are out there, what there are not studies for or downstream impacts. They might not need to do a full EIS because other issues are addressed. The only issue that needs to be addressed would be downstream impacts. Is the construction of all this finished? That's not in the record, Your Honor, and based on what Mr. Schneider said, no. But under Ocean Advocates' case, the Ninth Circuit case that we cite, the court still has the power to impose mitigation conditions. The Corps has the power to impose mitigation conditions to ensure compliance with the law. Now, Mr. Schneider takes issue. You didn't seek an injunction here, or did you seek an injunction? We didn't seek a preliminary injunction. We were seeking to have the – A permanent injunction. Yeah, we were not trying to stop the project, Your Honor. All right, so the project is ongoing. That's correct, but the Corps still has to make sure it complies with the law. There's numerous mitigation measures. It depends on what the downstream analysis shows. If there's big, major impacts caused by their dam, then that would have to be assessed and look at mitigation measures for that. Which might include what? Well, if there were major impacts, that could include changes to the project, but there also could be mitigation measures downstream. I keep hearing generalities. Okay. Like what? How about dredging the river downstream to get more volume downstream so that the water doesn't overtop the banks? Hardening of banks downstream to stop erosion. There's – Hardening of banks by pouring concrete? Not – Downstream by hardening might be riprap, rocks, other types of natural riprap. Sandbags? Yes, Your Honor. Those things have not been considered by – Other mitigation measures might be requiring them to raise the height of the dam? Yes. If that was the only practical way to avoid major impacts downstream, and yes, at that time there would be a question about whether that's an appropriate thing, but that's left for the Corps to look at in addressing these issues. The point out that the Corps does not agree that this is a collateral attack, and it's no reason to throw out the project entirely, but at AR 18336 through 18339 of tab 1 of ER3, that's the FERC analysis of water quantity. It's only a few pages. If you look there, there's nothing about downstream impacts. They told you to look at this document. Look at this document. It doesn't say – He said water quantity. That's flooding. The only consideration that FERC gave was for flooding upstream and relief up there. FERC did not look at downstream impacts, and as stated by our expert, Dr. McCarthy, the study of downstream impacts is inadequate. There's new information, and the project has been changed. I think, Your Honor, I'm over time. With that, again, our reply brief responds to each and every point that they've made. Please look at that. Looking at the policies, the policy of preventing downstream flooding is paramount in the Corps' duty, and that is one of the main things that Section 404 accomplishes, and that's what FERC expected the Corps to accomplish here, was to assess and mitigate downstream flooding impacts, and for these reasons we ask you to reverse the district court decision. Thank you. Okay, thank you. We thank both counsel for both the briefing and the argument. As the Court prepares to stand in recess until tomorrow, the Court does wish to acknowledge the death of our colleague, James Browning, on Saturday. It was announced publicly yesterday. Jim Browning was 93. He was appointed by President John F. Kennedy in 1961 and served on this Court for almost 51 years. Our federal courthouse, which is our headquarters in San Francisco, is named for him, and he served as chief judge of this Court for 12 years. So as we stand in recess, we also wish to acknowledge the great contribution of our colleague, Judge Browning. And with that, the Court stands in recess until tomorrow. Thank you very much.
judges: Hawkins, Bybee, Bea